## BALES v. ROBERTS, Appellant.

### Division One, May 24, 1905.

1. **SPECIFIC PERFORMANCE: Tender at Trial: Right to Rescind.** Subject to equities which may arise by fluctuations, etc., a tender of good title at the trial, in the absence of a clause in the contract for the purchase of land making time of the essence of the contract, is sufficient to authorize a specific performance. But that rule is not applicable if the other party had the right to rescind the contract. Where one party has the right to rescind the contract, the other cannot demand specific performance.

2. ————: **Rescission.** Frauds and mistakes in the inception of a contract are grounds for rescission. So also is a substantial breach of the contract, or a breach of a material or vital part of it.

3. ————: ————: **Exchanging Farms.** In pursuance to a contract to exchange farms, deeds were drawn up and placed in escrow to be delivered on the consummation of the deal, and thereafter defendant, without notice to plaintiff, substituted a deed conveying another quarter section, and, to cover his tracks, dated the new deed back to the date of the other one and had the acknowledgment also dated back, and caused to be forwarded to plaintiff's attorney for examination an abstract of the substituted tract, and later without notice to plaintiff and in his ab-

Vol 189 mo—4

sence, prematurely and in direct violation of the contract, persuaded the custodian of the deeds to deliver plaintiff's deed to him and hurried it to record, and at the trial of the suit brought by plaintiff to rescind the contract made a tender of a deed of the tract for which the contract called, and asked for specific performance. His excuse for his conduct was that plaintiff had by letters repudiated the contract, but these letters do not show a repudiation, but anxiety as to plaintiff's ability to fulfill and a desire to make new arrangements. *Held,* that defendant's breaches were of material parts of the contract, and entitled plaintiff to rescind it, and defendant is not, therefore, entitled to specific performance.

4. ———: ———: Recording Deed in Escrow. The annulment of a contract for the purchase or exchange of lands is authorized by the fraudulent or surreptitious obtaining of the deed placed in escrow and recording the same prematurely.

Appeal from Vernon Circuit Court.—*Hon. H. C. Timmonds,* Judge.

AFFIRMED.

*J. B. Johnson* for appellant.

(1) Although vendor may not have title or own the land at the time of making the contract, yet if he perfects his title and becomes the owner within the time limit of the contract and at the time suit was brought, equity will decree specific performance. Scannel v. American, etc., Co., 161 Mo. 621; Pomeroy on Contracts (2 Ed.), secs. 341 and 421. (2) Parties cannot complain of acts that are the result of or produced by their own wrong. Burris v. Park Improvement Co., 55 Mo. App. 381; Pomeroy on Contracts (2 Ed.), sec. 337. (3) The wrongful delivery of an escrow conveys no title even to a subsequent innocent purchaser, but performance makes delivery good. 2 Am. and Eng. Ency. Law (2 Ed.), 348-350. (4) The breach of contract to give party right to rescind must be vital and not susceptible to compensation. 7 Am. and Eng. Ency. Law (2 Ed.), 153. (5) As a general rule, equity will not rescind on the sole ground of breach, etc. 18 Am. and Eng. Ency.

Bales v. Roberts.

Pl. and Pr., 767; 21 Am. and Eng. Ency. Law (1 Ed.), 63; 28 Ib. 153; Pomeroy on Contracts (2 Ed.), secs. 29, 325, 358. And it is necessary, in an action to rescind, to allege and prove injury to plaintiff. 18 Ency. Pl. and Pr., 814. (6) If a party does, or offers to do, equity, he is in court with clean hands. Ansley v. Wilson, 50 Ga. 418; 11 Am. and Eng. Ency. Law (2 Ed.), 164. (7) Where there is partial performance only on one side, and the other party can be compensated as to the part where there is a failure, equity will enforce the contract and decree its specific performance. Pomeroy on Contracts (2 Ed.), sec. 434. (8) Variance in proof and contract set out in the pleadings to be enforced, no bar to decree for specific performance, as it may be cured by amendment. Story's Equity Jurisprudence (10 Ed.), secs. 770b, 770c; Pomeroy on Contracts (2 Ed.), secs. 255, 256; 20 Ency. Pl. and Pr., 467, 463.

*M. T. January* for respondent.

(1) If there was a mutual mistake as to the subject-matter, there was no contract, and specific performance, under such circumstances, cannot be decreed. 1 Story's Equity Jurisprudence (10 Ed.), sec 770b; Pomeroy's Specific Performance (2 Ed.), sec. 256. (2) Parties to a contract are entitled to more than mere performance at the proper time. They are entitled to the maintenance of the contractual relation during the life of the contract. Clark on Contracts, sec. 271 and 286; Morris, McIntosh & Co. v. Leiser, 73 Mo. App. 95. (3) He who comes into a court of equity must come with clean hands. 1 Pomeroy's Equity Jurisprudence, 432; Pomeroy on Specific Performance, 60; McClellan v. Darragh, 50 Ill. 249; Eastman v. Plummer, 46 N. H. 464; Goldthwait v. Lynch, 33 Pac. 699; Marble Co. v. Ripley, 10 Wall. 955; Holman v. Conlon, 143 Mo. 369.

LAMM, J.—Bales files his bill in equity against Roberts in such form, if the facts be found true, as to warrant relief (1) by holding for naught Bales' recorded warranty deed conveying certain lands in Vernon county, Missouri, to Roberts, and by vesting the title of said land out of Roberts and into Bales, and (2) by declaring a rescission of a certain real estate contract, resting partly in writing and partly in parol, whereby Bales swapped his said Missouri land for certain land in Ford county, Kansas.

Roberts by answer admitted some and denied other averments of the bill and plead facts which, if true, warranted the relief of specific performance of said contract.

On hearing, a provisional and interlocutory decree was entered awarding specific performance in favor of defendant on terms.

In due time the chancellor reopened the matter, heard further argument and, thus advised, set aside the provisional decree and entered a final decree in favor of plaintiff, in effect (1) canceling said deed, and (2) rescinding said contract, and (3) dismissing defendant's cross-bill.

Said decree was predicated of the following special finding of facts, embodied in the decree (the pertinency of which appears later in this opinion), viz: "That defendant contracted to sell the northwest quarter of section 13, and plaintiff intended to buy said quarter section; that under the contract entered into by and between the parties on November 11th, the defendant Roberts had no right to withdraw Bales' deed from escrow until an abstract of title had been furnished showing good title to said northwest quarter of section 13 in defendant Roberts; that at the time said Roberts withdrew the Bales deed from escrow he did not own said quarter section. The court therefore finds that defendant committed a breach of the contract in withdrawing said deed, that the breach was com-

mitted intentionally and wilfully and for the purpose of obtaining an inequitable and unconscionable advantage over plaintiff; that thereupon plaintiff had a right to and did demand a rescission of said contract; that during the pendency of said contract the conduct of defendant Roberts was marked with such acts of unfairness, lack of candor and fair dealing as to characterize him as one 'without clean hands' within the meaning of the maxim of equity. Wherefore it is ordered, adjudged and decreed,'' etc.

From this decree defendant appeals.

The case made is as follows:

Roberts owned certain detached tracts of land in Ford county, Kansas, among them the northeast quarter of a certain section 13, and was negotiating for other tracts, among them the southwest quarter and northwest quarter of said section 13. He was promoting the settlement of his country by encouraging immigration from Missouri, and was turning a penny at odd spells by selling Kansas lands to immigrants. With things in this condition, there fell a day in the early fall of 1901, when the course of events found Roberts in said Vernon county visiting a son-in-law, where, learning that Bales entertained an idea of trading his land for the purpose of increasing his cattle range, he called on him at his home, looked over Bales' lands and certain mules, etc. From this and other interviews it resulted that Bales and his wife went to Ford county, Kansas, to examine Roberts' trading properties. In the Missouri interviews, prior to this Kansas visit, it is agreed on all hands that Roberts with a stick marked out in the dust the lay of his trading lands in section 13. Both sides agree that the northeast quarter was included in the rude diagram, but Bales asserts the northwest quarter was also included, so as to make the offer include the whole north half of section 13, with other tracts, while Roberts insists the northwest quarter was not included but the southwest quarter was

designated, thus showing the quarter sections which it was proposed to trade, instead of lying side by side, cornering with each other. It is also testified by Bales that prior to the ultimate contract Roberts laid claim to certain rather indefinite but, at the same time, somewhat tangible rights in vast pasture lands adjacent to the properties he proposed to put into the trade and that he, Roberts, was in the present enjoyment of certain dignified financial gains resulting from the usufruct of these pastures, all of which "rights," with gains to accrue, he would set over to Bales. While Roberts admits that pasturing privileges on lands outside of the trade were talked over, yet he insists that he made full disclosures to Bales that the character of his possession was the mere shadowy one of a squatter who from year to year used the perishing grass on non-residents' land without any lease or license from absent owners and entirely subject to the owner's whim on discovery.

In November, 1901, Bales and his wife went to Ford county, Kansas, as said, where Roberts entertained them for a week or thereabouts, showed them over the lands he proposed to trade, pointed out the advantageous conditions of the country then existing, and others *in nubibus*, and indulged in what is known in the books as "dealer's talk," i. e., such *commendatio* as furthered the trade and caused the hope to spring in Bales' breast of a fetching bargain. In these talks the aforesaid "pasture rights" were gone over, Bales on his part reaffirming the same representations alleged by him to have been made by Roberts in Missouri, and Roberts, on his part, affirming frank disclosures of the true state of his "rights" unaccompanied with either *suppressio veri* or *suggestio falsi*.

The upshot was that on November 11, 1901, the following written memorandum was drawn and signed, evidencing part of the contract:

"Bucklin, Kas., Nov. 11, 1901.

"Contract made this date between C. M. Roberts and A. D. Bales.

"First: C. M. Roberts, has deposited with the Western Banking Company of Bucklin, Kansas, a deed for certain Ford county, Kansas, lands, in favor of A. D. Bales.

"Second: A. D. Bales, has deposited with said bank a deed to certain lands in Vernon county, Missouri, in favor of C. M. Roberts.

"Third: C. M. Roberts agrees to accept the deed to the Missouri lands subject to a $3,000 mortgage, with interest paid to March, 1902.

"Fourth: A. D. Bales agrees to execute a mortgage on the Ford county land for two thousand dollars, in favor of C. M. Roberts, one thousand to be paid in one year from this date and one thousand to be paid in two years from this date, with interest at six per cent per annum, or the rate of interest C. M. Roberts has to pay on the Missouri land, whatever that may be.

"Fifth: C. M. Roberts sells to A. D. Bales, March 1, 1902, thirteen horses now on his ranch, and all farming implements, except harnesses and saddles and bridles, also one binder, one gang-plow and one-half interest in the grain-drill on the Thurston farm, two road wagons, one farm wagon, one spring wagon.

"Sixth: A. D. Bales sells to C. M. Roberts, March 1, 1902, sixteen mules coming one year old, and six mules coming two years old, nine head of horses, two farm wagons, one old buggy, one two-seated carriage, also other farming utensils in use on his farm, except harness, saddles and bridles.

"Seventh: Each part agrees to take good care of the stock from now until March 1, 1902, and is not to be responsible for loss of same by natural death.

"C. M. ROBERTS,
"A. D. BALES."

Simultaneously with the drawing and signing of this partial contract, Bales noticed that talked-over ''pasture rights'' were not included by the scrivener, and, on his demand, Roberts executed and delivered to him the following further signed memorandum:

''In connection with our trade made this day it is understood that Mr. A. D. Bales shall have two wind mills and any rights I may have to the big pasture west of the ranch.

''Bucklin, Kansas, Nov. 11, 1901.

''C. M. ROBERTS.''

Bringing forward to this point another phase of the case, it seems Bales' land comprised 320 acres and was mortgaged for $4,500 and Roberts' land was dealt with as clear of incumbrance. The following parts of the contract, about which there is practically no dispute, rested in parol:

(1) The land to be conveyed by Roberts was 640 acres in three separate parcels some miles apart, clear of incumbrances.

(2) The trade was made on the theory of an even swap; Bales was to pay off $1,500 of his incumbrance.

(3) Bales was to turn over his 16 one-year-old mules and his 6 mules coming two-year old, referred to in the foregoing writing, to Roberts at the price of one thousand dollars, he was then to execute a mortgage on the Kansas land to Roberts for an additional $2,000, which together with said 22 mules equaled the $3,000 incumbrance to be left on the Missouri land.

(4) Abstracts were to be furnished back and forth, showing perfect titles on each side, barring the incumbrance, reduced to $3,000, to be left on the Missouri land.

(5) The contract entire was to be consummated by an exchange of deeds, possession, etc., on March 1, 1902.

Referring to that portion of the supplemental pa-

rol contract relating to placing the deeds in escrow, Bales testified as follows: "We give the deeds to Mr. Aulls" (Mr. Aulls was chief officer of the Western Banking Co. of Bucklin, referred to in the written contract) "and Mr. Aulls took them, and I says, 'Now Mr. Aulls, we will expect you to hold these deeds, these papers until it is satisfactory on both sides.' Mr. Aulls says, 'Yes, sir, I will put them in a big envelope, seal them up, and put them in my safe, and they shan't be opened until both parties are satisfied, and perfect title, and both parties present.' "

We have been unable to put our finger on any testimony of Roberts substantially contradicting the express agreements and those implied from the foregoing evidence.

Two depositions of the Mr. Aulls referred to were taken and read at the trial, and no substantial contradiction of the above evidence of Bales exists in either.

So that, for the purposes of this case, the powers and duties of Aulls in the premises and the rights of the parties under the arrangement whereby the deeds were placed in escrow, may be assumed to be as indicated by Bales' said testimony.

The following matter is in dispute and the contract to that extent depends on the view taken of the testimony: Bales testifies that one of the tracts contracted to be conveyed to him was the north half of section 13, township 48, range 24, in Ford county. Roberts testifies that only the northeast quarter in said north half was to be conveyed, and that the southwest quarter of said section 13 was to be conveyed instead of the northwest quarter.

It was shown at the trial that Roberts' deed, deposited under the contract and dated on November 11, 1901, conveyed the said northwest quarter of section 13 with other lands to Bales. It was testified by Mr. Aulls who caused both deeds to be drafted by his clerk, that he got the description of Bales' land from a tax re-

ceipt furnished by Bales, and Roberts' description from information then and there given by Roberts, and it was testified to by Bales, and denied by Roberts, that Bales called for a description of the Roberts' land at the time for the purpose of making a memorandum thereof in a book he had, that Roberts called out the description and he, Bales, set it down and the book memorandum was introduced showing the northwest quarter included in the land to be conveyed and which actually was conveyed by Roberts' deed then left in escrow.

Bales returned home, and on November 23, 1901, Roberts secured title to the southwest quarter of section 13, and thereafter, about the last of December, 1901, furnished to Aulls abstracts of title excluding the northwest quarter and including the southwest. At this time Aulls discovered that the northwest quarter was not in the chains of title evidenced by the abstracts, and called Roberts' attention to the omission. Roberts then claimed that Aulls had made a mistake in drafting the deed, and had included the northwest quarter by mistake; he thereupon caused a new deed to be drafted and executed, conveying the southwest quarter to Bales, with the other land, which new deed was deposited with Aulls, Aulls declining to surrender back Roberts' first deed, but keeping the same, as he says, "to show the transaction." *This new deed was dated back to the date of the old one, November 11, 1901, and the acknowledgment was also dated back to that date, and said acknowledgment was taken by the same notary, to-wit, the clerk of Mr. Aulls.*

Shortly thereafter Aulls forwarded the abstracts to a bank in Nevada, Vernon county, including the one covering the southwest quarter, to be turned over to Bales for examination. At a date in January, 1902, Bales took said abstracts to Birdseye and Harris, attorneys, abstracters and title examiners in Nevada, for

examination, and left an order to have his own abstract completed.

On January 13th, Birdseye and Harris wrote Aulls raising, among other questions, a question of tax titles disclosed by the abstracts, but as such questions are not pressed here, it will not be necessary to notice that part of their letter. Omitting the immaterial parts, and the caption, the letter follows:

"At the request of Mr. Bales, we write to you in relation to a certain land deal he is having with one Roberts. . . . And there are some minor defects in the abstract which we will not set out or designate at this time, as Mr. Bales says there is no use to go any further in the matter; . . . That the tract of land in 13, 28, 24, was to be the north half of the section and the abstracts cover the northeast and the southwest quarters, and Bales says he does not want the south-west quarter at all. It is no such land as the northwest. These are sufficient to settle the matter and unless he can get the land he saw and bargained for . . . he will have none of it. He further states that you spoke of sending the papers to a son or son-in-law of Roberts here to close up the deal. He says you are not to turn his deeds to anyone without his orders, and expect to hold you responsible for the same. Unless Roberts can let Bales have the land he showed him and for which Bales bargained . . . Bales says the deal is off and he will call in his papers.

"Please let Mr. Roberts know the fact and give him an opportunity to square himself in the deal by sending title papers, or abstracts to the land Bales bargained for, and if he can not do that, advise us soon, and send Bales' deed to him, and we will instruct the bank to return the abstracts we have examined.

"Awaiting your advice in the matter, we remain,

"Yours very truly,

"BIRDSEYE & HARRIS."

Antedating this letter, Bales wrote Roberts as follows, under date of November 21, 1901:

"Mr. C. M. Roberts.

"Sir I will drop you a few lines we got home all O K we are haven fine weather but it is very dry penitlen and wife were don Sunday, Mr. Roberts I don't see how I can sut that morgedon to $3000 as I will have soo much fead to by this winter you see the mules I let you have is the same as one thousand in cash as I bot them this fall and if I wod give you a morge on that land out there that wod tye me up soe I codent doe eny thing while you wod have the morge I give you to ues for clatteral and I woodnt have eny thing soo I dont see how I can fix it only to let $4000 stand on this and give you a morge on that it ma be that I can get the money here on the land out there if you will send me the mans name that you are haven to getten up the abstract and the numbers of the land.

"Yours truly, A. D. BALES."

And on December 4, 1901, he wrote Roberts as follows (his wife adding a postscript):

"Mr. Roberts, Sir:

"I received your letter we have had noe rain sence we come back and it is awfle dry I have commenced ploowin but the gron is dry and hard it has been clody for three days and it is ranin some tonite the mules and the colts has all got the stemper but are geten along all rite wheat looks fine you spoke of school sexion that cod be entered where does it lay at if you can hold it till the first of march maybe I can take one quarter I don't know wher my daughter wil come out ther this spring or not you spoke of haven the abstract got up and leve it at the Bank I will have to have the abstract exizamed and you git it as soone as possible and send it to me and I have the abstract of mine and penitlen can have it exzamened for you if you wis I want to make ar-

rangement for that money here if I can and I wil haft to have the abstract here the abstract and the dead both aint the dont give me eny chance to doe eny thing here and we want to noe every thing is all rite before we move yours truly.

"A. D. BALES.

"The grond is covered with that has falin sence I comenced reiten.

"Mr. Roberts i dont know what to say about the stoves as my stove is so much better than yours, your stove woont do me no good you will haft to do a little better if i tradt with you if you want to leave both cooks stoves as they are I will leave all three (3) stoves stand hear in the house that will give you four good stoves hear and me (3) out there so do as you like yours truly, Mrs. Bales."

And on December 31, 1901, he wrote Roberts as follows:

"Mr. Roberts, Sir

"I thought I wod drop you a few lines in regard to our traden farms I dont know how we will fix the trade as my wife says she was guled into it and she says she wil never go to Kansas and I dont know what to doe if you wod keep that soth quarter at $2500 I think I cod fix it Mr. Roberts I want to doe what is rite so you see there is $4500 morage on my place and my wife says she wont go out there put me in shape that I cant doe enything if you cod come don maybe we cod fixet ip up we are haven fine weather here know seen Mr. penitlen and wife in town today and he said you wanted to move abot feb will say that I will have no grain I have to by my grain as think I wil have some hay to spair yours          A. D. BALES."

Holding a fluent pen and gifted with a superfluous original knack in spelling, Bales on the same day wrote Aulls as follows:

"Mr Awls Sir

"Ẉill drop you a few lines askin you to hold the Deed we left with you till I notify you to turn it over to Mr. Roberts as there is some Diference betwen our trade not setled yet are there much land changen hands round Bucklin there is some parties here talkin of comen out there to look at the contry weare haven a very fine winter here every Body is plowin like it were Spring how is thee rond hows are there much improven goin on in Bucklin kansas

"Yours truly, asken you to ancer these few lines Direct to Walker, Vernon          A. D. Bales."

Finding a substitution of land indicated by Roberts' abstracts, and rendered uneasy thereby, Bales took the train for Kansas to see what was the matter and arrived at Bucklin before Birdseye and Harris's letter reached Aulls. As he got off the train on the morning of January 14th, he unexpectedly met Roberts at the depot in Bucklin and a controversy at once arose over the substituted land, in which Roberts denied showing or selling Bales the northwest quarter and Bales asserted the contrary, and Roberts expressed surprise at Bales' coming, when a one-cent postal card would have done as well. The parties finally went to Aulls' bank and Aulls sent to the postoffice and got Roberts' abstracts with the Birdseye & Harris letter. Here, after reading the letter, the controversy was renewed and Roberts told Bales if he was "going to have a case," he "wouldn't want more than about three of them Missouri lawyers." An effort was made to settle, by personal inspection, whether there was any difference in value between the southwest quarter and the northwest quarter, which proved abortive, and finally Roberts and Bales came to Dodge City on the night of the 14th and, on Roberts' suggestion, an attorney was called in to examine the abstracts who worked on them the next day. That evening Bales left for home, and

Roberts came to the train and told him he was going to North Missouri to see his mother who was poorly. Bales' train left at 3:30 p. m., and Roberts' left at four o'clock.   As Bales' train stopped at Bucklin, he chanced to see Aulls at the depot and *then for the first time learned from him that in the morning of the day before, prior to Bales' appearance at Bucklin, Roberts had got possession of his, Bales', deed.   He also, for the first time, ascertained another fact, viz., that Roberts had made a new deed and deposited it with Aulls, conveying the southwest quarter with the other land.*

On the way home, at Emporia, Bales opened communication with Mr. January, his attorney, at Nevada, by telephone, who commenced this suit and got service on Roberts in Nevada, to which point Roberts, forgetting his ill mother for the moment, had raced in advance of Bales and filed the deed for record on the 16th or 17th of January, 1902.

The record shows that Roberts' excuse for recording Bales' deed prematurely was his suspicion that Bales would place other incumbrances on the land, though no evidence was introduced showing such intention.   The record further shows that Roberts' excuse for taking down Bales' deed in violation of the contract under which all the deeds were left in escrow until March 1, 1902, was his construction placed on Bales' letters to the effect that he, Bales, intended to repudiate the contract and refuse to consummate the deal.   The record further shows that Aulls demurred to giving up Bales' deed, whereupon suggestion was made of a law suit against him by Roberts.   Roberts insisted he had fully complied with his contract and was entitled to his deed.   Aulls was *dubitante.*   Aulls and Roberts then went to the office of Sutton and Skate (Roberts' attorneys) and, after hearing the controversy, an oral decree, *rusticum judicium,* was entered in favor of Roberts, which Aulls presently obeyed by

delivering the deed—and all this with no notice to Bales and behind his back.

Much evidence was introduced pro and con on the relative lay, quality of soil and value of the southwest quarter and the northwest quarter of said section 13. So, too, at great length the question of the good faith of Roberts in dealing with his "pasture rights" in the adjacent outlaying wild land, was gone into. On Bales' side it was shown that a certain school-land lease held by Roberts on a certain quarter section was a key to the pasture situation and that Roberts concealed the fact that he had parted with his beneficial interest in this school lease, with a half interest in the so-called pasture rights, to a Mr. Kinkade, immediately before his contract with Bales. On Roberts' side it was shown that the Kinkade deal had nothing to do with the Bales contract and that he substantially explained to Bales the Kinkade transaction. But we deem the details of this part of the case not material to the equities involved in the principal controversy.

It was conceded that the sale of the personal property, other than Bales' mules, referred to in the contract, had nothing to do with the land trade and was a mere collateral incident of no controlling importance.

On Roberts' part it was shown that when Bales objected to the southwest quarter, on his January trip to Kansas, Roberts, while not conceding his right to it, finally offered to put the northwest in the trade, if that would satisfy Bales. On the other hand, Bales says that Roberts offered to put it in if he, Bales, would pay the difference in price, $200, which Bales refused to do. The evidence would justify the trial judge in taking Bales' views of this last controversy.

On February 10, 1902, after suit, Roberts procured title to the northwest quarter of section 13. On February 17th, he duly recorded his conveyance, and afterwards, by answer, as well as actual tender at the trial, tendered an abstract showing a good title in him to the

northwest quarter and gave plaintiff the option of taking his first warranty deed deposited in escrow covering the northwest quarter or his second warranty deed deposited in escrow covering the southwest quarter.

On such statement of the substantial facts, was the decree below a legitimate and logical product of the paper and trial issues, or was it, *e converso*, a *non sequitur?* We think the decree was the only one the learned chancellor should have entered, and this for the following reasons:

I. It is contended by counsel for appellant 'that the fact of Roberts not having title to the northwest quarter at the time of the contract, November 11, 1901, is no bar to specific performance, where, as here, he shows title at the trial and tenders a good title, a perfect abstract and a proper conveyance, and where, as here, time is not of the essence of the contract.

This proposition may be conceded to appellant; for it is good law that subject to equities which might arise by fluctuation in values and subject to exceptions not necessary to consider because not in the case, a tender of good title at the trial is well enough in the absence of a clause in the contract making time of the essence of the contract and in the absence of the existence of such surrounding circumstances as, in effect, make time of the essence of the contract. [Scannell v. American Soda Fountain Co., 161 Mo. l. c. 621.] But in the view we take of this case, the whole question of specific performance becomes of no importance, because of Bales' right to rescind, presently to be considered; since it goes without saying if Bales has the right to rescind, Roberts cannot at one and the same instant of time have the right to demand specific performance. The two rights are self-evidently repugnant and cannot exist *in praesenti*, in opposing parties to the same controversy.

By the same token the proposition advanced by

counsel to the effect that where there is partial performance on one side and the other party can be compensated as to the part where there is a failure, equity will, on terms, enforce the contract and decree its specific performance, may be conceded. The books abound in cases illustrating how and when this may be done and especially when a vendee, not in fault, is willing to take part-performance with compensation for as much as cannot be performed.

Nor in this case will it be necessary to consider the principles of equity applicable to recission of contracts where the right to rescind exists but where there has been such part-performance as will require terms in the decree in order that justice may be done in disentangling the existing contract relations and in placing all parties *in statu quo;* for the contract in hand at the time of instituting suit remained to all substantial intents and purposes wholly executory.

II.   Not only fraud and mistake in the inception of a contract are grounds for rescission, but matters subsequent may create a voidability authorizing rescission. [Morrison v. Leiser, 73 Mo. App. 95.] But, as none of the affairs of a practical people are susceptible of being transacted with the nicety of mathematical precision, or with that ideal perfection outlined in the dreams of Utopian philosophers, it has accordingly been held that while a breach of contract by one party may entitle the other to rescission, yet a breach which is to be followed by such drastic result must be a substantial breach, a breach of a material or vital part of the contract; and, in some of the cases, to the gravity of the breach the idea of willfulness is added and accentuated.   Speaking of the general rule, Mr. Bishop (Bishop on Contracts, sec. 827), says: "Ordinarily, and subject to limitations which will appear as we proceed, whenever a contract requires successive steps to be taken by the respective parties, if, when a step becomes due, the party either by words or by their equiv-

alent in acts declines to take it, or is unable, while the other is ready and willing to do his part, the latter may rescind the contract. Or, if he chooses, he can sue for the breach. He cannot do both." And again, sec. 828: "Not every shortcoming of a party will authorize the other to rescind. The nature of the particular case must be considered and it is probably impossible to state a rule applicable to all varying facts. In an English case, LITTLEDALE, J., set it down as settled 'that, if there is only a partial failure of performance by one party to a contract, for which there may be compensation in damages,' there cannot be a rescission. In some other English cases, 'the true question' has been said to be 'whether the acts and conduct of the party' against whom the recission is undertaken 'evince an intention no longer to be bound by the contract.' While each of these rules is justly to be applied," says our author, "in the circumstances for which it was meant, there are others in which its attempted application could only mislead. If one fails to perform the condition of his contract, . . . or if, as stated in the last section, he declines to take a step in a contract providing for alternate steps by the respective parties; or, *a fortiori,* if he disqualified himself to perform, plainly the other party may treat the contract as rescinded. And, in general terms, the doctrine is, that the breach, to justify a rescission, must be of a dependent covenant, *or wilful,* or in a substantial part comprehending the root of the whole."

Before undertaking to apply the general principles thus outlined by Mr. Bishop to the facts of this case, it would seem that a resume of the facts which the record justified the chancellor in believing to exist would not be amiss, thus: the record abounds in evidence showing (1) that Bales bought the northwest quarter of section 13, (2) that he did not buy the southwest quarter of section 13, (3) that Roberts with Bales' knowledge conveyed the northwest quarter to him and

put the deed in escrow to be delivered to Bales on the consummation of the deal on March 1st, 1902, (4) that Roberts without notice to Bales substituted a deed conveying the southwest quarter, and then, to cover his tracks, dated the new deed back to the date of the old and had the acknowledgment thereof ante-dated so as to aid in the deception, and caused to be forwarded to Bales an abstract of the southwest quarter instead of the northwest quarter. Distant from the place and presumably unfamiliar with the descriptions, this cunning, unwarranted and clandestine substitution would have naturally passed undiscovered had Bales not taken time by the forelock and armed himself with a book memorandum of descriptions of the tracts of land he contracted to buy. The record further shows (5) that without notice to Bales and in his absence, he prematurely and in direct violation of the contract, with earmarks of bad faith, persuaded the too willing custodian to deliver Bales' deed, and which deed he then hurried of record in Vernon county.

When all these things had been done, what resulted? It befell as follows: (1) Bales had no record title to any land, while Roberts held title to all. (2) Bales was left to try out a controversy over substituted deeds before Aulls, the depository, who had, under the facts proved by the testimony, improperly taken Roberts' side of the controversy, or was left to seek relief in distant courts, or, as a *dernier resort,* had the poor privilege of settling the controversy by agreement with Roberts on a basis not contemplated by the original contract, and with Roberts, by his own wrong, possessed of a whip to scourge Bales to an inequitable adjustment and showing an apparent disposition to use it.

All these breaches of the subsisting compact, with the resulting change in the situation, were brought about by Roberts under the plea that Bales' early letters showed he did not intend to go on with the exchange, therefore, as argued by his learned counsel, he

was entitled to take the precautions of a "wide awake business man," and take down and record Bales' deed. But do Bales' letters show he had repudiated the contract? We think not. They showed anxiety, they suggest doubt, and they strive to make a new arrangement about the mortgage, and that is as far as they go. After these letters were written Bales gave an order for the completion of his abstract, took Roberts' abstracts to his attorneys and procured their examination, and there is no satisfactory evidence of any vital breach contemplated on his part. So that, even if we were to hold (which we do not do) that Roberts would have been justified in his over-reaching conduct had he reason to fear a contemplated breach on Bales' part, yet in this case no such excuse has a basis of fact. The most significant letter Bales wrote is that of December 31, 1901, in which his domestic trouble over the trade is spoken of. But that is susceptible of a more favorable reading than as notice of a repudiation of the contract.

Applying the general rules laid down by Bishop and heretofore quoted it will be seen that the breaches of the contract by Roberts were not only willful and surreptitious, but were of material parts of the contract and therefore Bales had the right to rescission. The new situation created by Roberts caused him and Bales to be unequally yoked together practically with no existing *aggregatio mentium,* and equity, which is a bounden handmaiden of honor and morality, should delight in cutting in twain all their contractual bonds.

III. A rescission of the contract would itself suffice to annul the deed, but further, its annulment is justified because "a deed," as quaintly said by an old law writer, "speaks alone by delivery." Bales' deed, in the eye of the law, as it lay in escrow, was a mere scroll. Its wrongful and untimely delivery by the custodian must not be allowed to be of any efficacy. As aptly put by a text-writer: "A deed or other instru-

ment deposited as an escrow is nothing more than a mere scroll until the condition is fully performed or the contingency happens upon the faith of which it was deposited; and this being so, no title passes prior to that time without the grantor's consent. The grantee or the other party who is to receive the benefit of the instrument cannot acquire the title by gaining the possession of it by theft, by fraud, or by the voluntary act of the depositary, but only by the performance of the condition or the happening of the contingency." [11 Am. and Eng. Ency. Law (2 Ed.), 348.]

The record of this deed in Vernon county under the facts of this case created a malignant cloud on Bales' title and became an affront to justice—a sin against the law. It was rightly annulled.

Perceiving no error, the decree, *nisi*, is in all things affirmed.

All concur.